IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| SANDRIDGE ENERGY, INC., *et al.*, | § § | Case No. 16-32488 (DRJ) |
| Reorganized Debtors. | § § § | Jointly Administered |
| *Baker Farms, Inc. and Steven T. Bouziden Revocable Trust, Steven T. Bouziden, Trustee*, | § § § § | |
| Royalty Owners, | § § | Adv. No. 16-03223 |
| v. | § § | |
| *SandRidge Exploration and Production, LLC*, | § § § | |
| Reorganized Debtor. | § § | |

**ROYALTY OWNERS' REPLY BRIEF
ON SPECIFIED QUESTIONS OF LAW**

**Table of Contents**

Summary ........................................................................................................................................1

Argument ......................................................................................................................................2

    I.     Claims Under the Kansas Leases "Rode Through" the Bankruptcy because SandRidge Neither Assumed nor Rejected Them under Section 365 ........................................................................................................2

         A.    Kansas Minteral Leases are "Unexpired Leases" under Section 365 ......................3

         B.    Kansas Mineral Leases are "Executory Contracts" under Section 365 ...................7

    II.    Claims under the Oklahoma Leases are Secured by Statutory Liens that Passed Through the Bankruptcy Because SandRidge Failed to Strip Them ........................................................................................................9

         A.    The Royalty Owners' Claims for Royalty Underpayments on the Oklahoma Leases are Secured by Statutory Liens ..........................................10

         B.    The Royalty Owners' Liens Remain Valid and Tracing is Not Required ................................................................................................11

Conclusion ..................................................................................................................................13

## Table of Authorities

**Cases**

*Ali v. Fed. Bureau of Prisons*,
   552 U.S. 214 (2008) ................................................................................................... 4

*Century Indemn. Co. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.)*,
   208 F.3d 498 (5th Cir. 2000) ...................................................................................... 2

*Commercial Asphalt, Inc. v. Smith*,
   200 Kan. 362 (1968) ................................................................................................... 8

*Elixer Indus., Inc. v. City Bank & Trust Co. (In re Ahern Enters., Inc.)*,
   507 F.3d 817 (5th Cir. 2007) ...................................................................................... 9

*Frontier Energy, LLC v. Aurora Energy, Ltd. (In re Aurora Oil & Gas Corp.)*,
   439 B.R. 674 (Bankr. W.D. Mich. 2010) ................................................................... 5

*Gaskins v. Texon, LP*,
   321 P.3d 985 (Okla. Civ. App. 2013) ...................................................................... 10

*In re Clark Resources, Inc.*,
   68 B.R. 358 (Bankr. N.D. Okla. 1986) ...................................................................... 6

*In re Crusader Energy Group Inc.*,
   No. 09-31797 (Bankr. N.D. Tex. Nov. 2, 2009) ......................................................... 3

*In re Gasoil, Inc.*,
   59 B.R. 804 (Bankr. N.D. Ohio 1986) ................................................................... 5, 6

*In re Heston Oil Co.*,
   69 B.R. 34 (N.D. Okla. 1986) .................................................................................... 6

*In re J. H. Land & Cattle Co., Inc.*,
   8 B.R. 237 (W.D. Okla. 1981) ................................................................................ 3, 7

*In re Spring Valley Farms, Inc. v. Crow (In re Spring Valley Farms, Inc.)*,
   863 F.2d 832 (11th Cir. 1989) .................................................................................... 9

*Ingram v. Ingram*,
   214 Kan. 415 (1974) ...................................................................................... 4, 5, 6, 7

*Jupiter Oil Co. v. Snow*,
   819 S.W.2d 466 (Tex. 1991) ...................................................................................... 3

*Nowlin v. Peake (In re Nowlin)*,
   576 F.3d 258 (5th Cir. 2009) ...................................................................................... 4

*Phoenix Exploration, Inc. v. Yaquinto (Matter of Murexco Petroleum, Inc.)*,
  15 F.3d 60 (5th Cir. 1994) ........................................................................................... 7

*River Prod., Co., Inc. v. Webb (Matter of Topco, Inc.)*,
  894 F.2d 727 (5th Cir. 1990) ....................................................................................... 3

*Stumpf v. McGee (In re O'Connor)*,
  258 F.3d 392 (5th Cir. 2001) ....................................................................................... 2

*Thurner v. Kaufman*,
  237 Kan. 184 (1985) ................................................................................................ 8, 9

*United States v. Gonzalez*,
  50 U.S. 1 (1997) .......................................................................................................... 4

*United States v. Sirois*,
  87 F.3d 34 (2d Cir. 1996) ............................................................................................ 4

**Statutes**

11 U.S.C. § 365(b) ............................................................................................................. 2

11 U.S.C. § 365(m) ..................................................................................................... passim

52 Okla. Stat. tit. 52, § 549.1 *et seq.* (2010) ................................................... 2, 10, 11, 12

**Other Authorities**

BLACK'S LAW DICTIONARY 1299 (7th ed. 1999) ............................................................. 4

Jeffrey S. Battershall, *Commercial Leases and Section 365 of the Bankruptcy Code*,
  64 AM. BANKR. L.J. 329, 339 (1990) ......................................................................... 6

Pub. L. No. 98-353, 98 Stat. 333, § 362 (codified as amended at 11 U.S.C. § 365) ........ 6

**Summary**

1. The sole question here is whether the Royalty Owners[1] can prosecute a lawsuit, individually or as a class, against SandRidge to recover unpaid royalties that accrued prior to the Effective Date of the Chapter 11 Plan. The merits of the underlying claims are, by agreement of the parties and Court order, not at issue. This is important to reiterate because, as discussed below, many of SandRidge's arguments go to the merits of the underlying claims and are, accordingly, beyond the scope of this adversary.

2. The Royalty Owners' claims under the Kansas Leases should be allowed to proceed against the reorganized debtors because, as a matter of Fifth Circuit law, and despite boilerplate plan language that would suggest otherwise, the leases "rode through" the bankruptcy when SandRidge declined to either assume or reject them either during the case or as part of its plan of reorganization. SandRidge does not argue with Fifth Circuit law, but instead argues that the Kansas Leases are not subject to section 365. SandRidge's flawed analysis relies exclusively on Oklahoma decisions applying Oklahoma law; fails to acknowledge key, dispositive differences in Kansas law that make mineral leases in that state executory contracts; and wholly ignores section 365(m), which broadly defines leases to include "any rental agreement to use real property," which plainly includes a license to enter upon land to explore for hydrocarbons, which is what Kansas law says a mineral lease is. 11 U.S.C. § 365(m).

3. The Royalty Owners' claims under the Oklahoma Lease should be allowed to proceed for a different reason. In Oklahoma, Royalty Owners benefit from a recently enacted statute that grants self-perfecting, super-priority liens to secure royalty payments. The statute expressly requires that its provisions be "liberally construed" to afford royalty owners "the most

---

[1] Unless otherwise defined, capitalized terms have the definitions assigned to them in the Royalty Owners' opening pre-hearing brief [ECF 35] or the Joint Stipulation of Facts for Adversary Proceeding No. 16-03223 [ECF 36], as applicable.

1

comprehensive protection." 52 Okla. Stat. Ann. § 549.12. SandRidge failed to take action to strip these liens either during the case or in its plan of reorganization. Fifth Circuit law is clear that, in these circumstances, the liens survive the bankruptcy in spite of boilerplate plan language that would suggest otherwise.

## Argument

I. **Claims under the Kansas Leases "Rode Through" the Bankruptcy because SandRidge Neither Assumed nor Rejected Them under Section 365.**

4. Reorganized SandRidge continues to operate the Kansas Leases. Joint Stipulation ¶ 26. Despite continuing to enjoy the benefits of the Kansas Leases, SandRidge argues that it has no obligation to cure its pre-petition underpayments to the Royalty Owners.

5. It is settled law that a debtor cannot keep the benefits of an executory contract or unexpired lease and avoid its cure obligations under section 365 by simply refusing to assume the contract. *Stumpf v. McGee (In re O'Connor)*, 258 F.3d 392, 400, 404–05 (5th Cir. 2001). If a chapter 11 debtor neglects to assume or reject an unexpired lease during its bankruptcy case, the lease "rides through" the bankruptcy and the counterparty to the lease may bring any claims for any pre-petition breach against the reorganized debtor. *Id*. This rule ensures that a debtor cannot "eviscerate[e] the protections [section 365] offers to non-debtor parties." *Century Indemn. Co. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 509 (5th Cir. 2000); *see also* 11 U.S.C. § 365(b)(1) (a debtor cannot assume a contract without curing defaults).

6. SandRidge seeks to do precisely what *O'Connor* and *National Gypsum* prohibit – continue to benefit from unexpired gas leases as a reorganized debtor without satisfying its cure obligations. SandRidge does not dispute the ride-through principle, but instead argues that the Kansas Leases are not subject to section 365.

2

7. Every court to address the question has held that mineral leases under Kansas law are subject to section 365. *E.g.*, *In re J. H. Land & Cattle Co., Inc.*, 8 B.R. 237, 238–39 (W.D. Okla. 1981); Order Granting Motion Regarding Assumption of Executory Contracts / Unexpired Leases (Kansas Oil and Gas Leases and Other Leases), *In re Crusader Energy Group Inc.*, No. 09-31797 (Bankr. N.D. Tex. Nov. 2, 2009) [ECF No. 884] (granting motion to assume Kansas mineral leases and providing cure amounts).

8. SandRidge cites no cases, and counsel is aware of none, applying Kansas law and reaching a contrary conclusion. Instead, SandRidge urges the Court to adopt the reasoning of Oklahoma courts applying Oklahoma law. SandRidge's first error is to ignore a key difference between Oklahoma and Kansas law. In Oklahoma, like Texas, mineral leases are treated as conveying a freehold interest in fee.[2] In Kansas, mineral leases are leasehold interests that do not convey a present real property interest. Ohio and Michigan take the same approach, and courts in those states have held that mineral leases under those states' law are subject to section 365. SandRidge's second error is to ignore entirely section 365(m) of the Bankruptcy Code, which creates an expansive definition of "leases" under section 365 that plainly includes the Kansas Leases at issue here.

A. **Kansas Mineral Leases Are "Unexpired Leases" under Section 365.**

9. The Kansas Leases fall squarely within the expansive meaning of "leases of real property" under section 365, which Bankruptcy Code broadly defines to include "any rental agreement to use real property." 11 U.S.C. § 365(m).

---

[2] Conveyances of real property are not subject to section 365 because they are not true leases. *See Jupiter Oil Co. v. Snow*, 819 S.W.2d 466, 468 (Tex. 1991) (recognizing that a "common oil and gas lease is fee simple determinable estate in the realty"); *River Prod., Co., Inc. v. Webb (Matter of Topco, Inc.)*, 894 F.2d 727, 739 n.17 (5th Cir. 1990) (noting that "so-called leaseholds" that "actually constitute determinable fee interests" are not subject to section 365).

3

10. When interpreting a statute, courts "begin by examining its language" and "enforce the statute's plain meaning, unless absurd." *Nowlin v. Peake (In re Nowlin)*, 576 F.3d 258, 261–62 (5th Cir. 2009). "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219–20 (2008) (quoting *United States v. Gonzalez*, 50 U.S. 1, 5 (1997)). "Use" is also interpreted broadly to include "to avail oneself of" or "to carry out a purpose or action by means of." *United States v. Sirois*, 87 F.3d 34, 41 (2d Cir. 1996). "Rent" is another commonly understood term that means "consideration paid, usu[ally] periodically, for the use or occupancy of property." BLACK'S LAW DICTIONARY 1299 (7th ed. 1999).

11. Here, the Kansas Leases qualify as rental agreements to use real property. The leases are rental agreements because they require the lessee to make periodic payments – referred to in the leases as "royalties" – which are calculated as a percentage of price obtained from selling hydrocarbons produced. Joint Stipulation Exs. C ¶ 3; D ¶ 3; E ¶ 3; F at 1; G at 1. The leases themselves use the term "rental" to describe monthly delay payments due if production does not commence within a certain time following entry into the lease. Exs. C ¶ 4, D ¶ 4, E ¶ 4. These periodic payment requirements qualify as rental payments under the plain meaning of that term.

12. The leases involve the "use of real property," as a matter of Kansas law, because they convey the right "to enter upon the land and explore for such minerals and if they are discovered to produce and sever them." *Ingram v. Ingram*, 214 Kan. 415, 418 (1974); *see also* Joint Stipulation C ¶ 1; D ¶ 1; E ¶ 1; F at 1; G at 1. The specific rights in the Kansas Leases include the rights to build tanks, power stations, telephone lines, and other structures on the land in support of exploration activities. *Id.* Each of these activities would constitute a "use" of real

property under any reasonable interpretation of the word. Accordingly, the Kansas Leases are "rental agreements to use real property" and are therefore subject to section 365. 11 U.S.C. § 365(m).

13. The United States Bankruptcy Court for the Western District of Michigan recently reached the same conclusion when applying section 365(m) to mineral leases. *Frontier Energy, LLC v. Aurora Energy, Ltd. (In re Aurora Oil & Gas Corp.)*, 439 B.R. 674, 680 (Bankr. W.D. Mich. 2010). The court reasoned that mineral leases met the plain-meaning definition of "rental agreement" or "lease" because (1) the lessor was the original owner of the minerals, (2) the lease was for a defined term, (3) the lessee was required to pay rent, and (4) the right to exploit the minerals would revert to the lessor upon termination of the lease. *Id.* at 679–80. The court further contrast Michigan and Texas law, noting that Michigan courts do not consider an oil and gas lease to convey a fee interest, but instead convey a leasehold interest. *Id.* at 679.

14. The *Frontier Energy* analysis is on all fours with the Kansas Leases. Like the Michigan leases, the Kansas Leases (a) convey the Royalty Owners' mineral rights (b) for a defined term (c) in exchange for periodic rent (d) where the right to the minerals will revert to the Royalty Owners upon termination of the lease. As in Michigan, Kansas does not consider a mineral lease to convey a fee interest. *Ingram*, 214 Kan. at 418. As with the Michigan leases at issue in *Frontier Energy*, the Kansas Leases qualify as unexpired leases under section 365(m).

15. Similarly, the United States Bankruptcy Court for the Northern District of Ohio determined that mineral leases fall within section 365(m) because, regardless of the terminology used, "they at least convey a right to *use* real property." *In re Gasoil, Inc.*, 59 B.R. 804, 806 (Bankr. N.D. Ohio 1986) (emphasis added). In evaluating whether a mineral lease was a leasehold or freehold interest, the *Gasoil* court explained that "only a leasehold interest was

conveyed by an oil and gas lease where the lease used no words evidencing a grant of the minerals in fee." *Id.* at 807–08. The court concluded that, while courts may use imprecise terminology to describe the interest conveyed by a mineral lease, there was no question that a mineral lease conveys at a minimum the right to "use" real property. *Id.* at 806–808. This reasoning applies here because, like Ohio, Kansas interprets mineral leases as conveying the right "to enter upon the land and explore for such minerals and if they are discovered to produce and sever them." *Ingram*, 214 Kan. at 418. That right constitutes a "use" of real property within the broad meaning of section 365(m).

16. SandRidge relies on two Oklahoma decisions applying Oklahoma law for the proposition that a mineral lease is not a "lease" within the meaning of section 365. Sandridge Exploration and Production, LLC's Pre-Hearing Brief [ECF No. 34] ("SPHB") at 11–14 (citing *In re Clark Resources, Inc.*, 68 B.R. 358, 360 (Bankr. N.D. Okla. 1986); *In re Heston Oil Co.*, 69 B.R. 34, 36(N.D. Okla. 1986)). As a threshold matter, neither of those decisions considered section 365(m).[3] The *Clark Resources* court reasoned that a mineral lease was not a "lease" because it "does not give rise to an estate in land," but instead grants a "license to explore." *Clark Resources*, 68 B.R. at 358.[4] A license to explore qualifies as a "use" under section 365(m), and nothing in the *Clark Resources* decision holds otherwise. The *Heston* court reasoned that a mineral lease was not a "lease" because the interests conveyed "are generally

---

[3]    Although it is unclear from the opinions themselves, given that both were issued in 1986, it might be that section 365(m) did not apply to those bankruptcy cases. Section 365(m) was added to the Bankruptcy Code in 1984 as part of the Leasehold Management Bankruptcy Amendment Act of 1983, which was approved on July 10, 1984. Pub. L. No. 98-353, 98 Stat. 333, § 362 (codified as amended at 11 U.S.C. § 365).

[4]    As SandRidge points out, *Clark Resources* and the unpublished *Heston* opinion each criticized the reasoning of *J. H. Land & Cattle Co.*, which held that Kansas mineral leases were subject to section 365. Neither *Clark Resources* nor *Heston* provides any reasoning or explanation for their criticism, other than stating their disagreement with the conclusion reached. The *Clark Resources* opinion itself has been criticized in light of the addition of section 365(m) for "drawing an overly narrow definition of the term lease." Jeffrey S. Battershall, *Commercial Leases and Section 365 of the Bankruptcy Code*, 64 Am. Bankr. L.J. 329, 339 (1990).

6

considered as estates in real property having the nature of a fee." *Heston*, 69 B.R. at 36. That reasoning in inapplicable here because Kansas law is clear that a mineral interest "does not create any present vested estate in the nature of title to the land which it covers." *Ingram*, 214 Kan. at 418. *Heston* also fails to consider section 365(m).

17.  Under Kansas law and the definition of "lease" provided in section 365(m), the Kansas Leases are properly characterized as unexpired leases within the meaning of section 365.

B.  **Kansas Mineral Leases are "Executory Contracts" under Section 365.**

18.  In addition to being unexpired leases under section 365(m), the Kansas Leases create ongoing mutual obligations that satisfy the definition of an executory contract, thus providing a second and independent basis to apply section 365 here.

19.  SandRidge argues that the Kansas Leases are not executory because a breach by the Royalty Owners would not excuse SandRidge's performance. SPHB at 14–15. SandRidge misstates Kansas law and overlooks the rigorous requirements imposed on royalty owners by Kansas common law and the remedies available to leaseholders upon breach of those obligations.[5]

20.  "[A]n agreement is executory if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party." *Phoenix Exploration, Inc. v. Yaquinto (Matter of Murexco Petroleum, Inc.)*, 15 F.3d 60, 62–63 (5th Cir. 1994). Whether party has fulfilled all of its obligations under agreement is not necessarily decisive in deciding whether agreement is an "executory contract" that may be assumed or rejected; the issue is whether party's failure to

---

[5] SandRidge forgets the parade of horribles it used to justify paying pre-petition royalty claims at the start of the case. *See* Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing Mineral Payments and Working Interest Disbursements [Main Case ECF 9] at 4 ("Failure to pay Mineral Payments could expose the Debtors to such enforcement actions and could result in actions seeking the forfeiture, cancellation, or termination of Oil and Gas Leases.").

7

perform any unperformed obligations would constitute a material breach of agreement. *Id*. Here, both parties have unperformed obligations that could result in a material breach.

21. Under the Kansas Leases, the Royalty Owners have given Sandridge the right to explore and drill for hydrocarbons and operate oil and gas wells. Joint Stipulation, C ¶ 1; D ¶ 1; E ¶ 1; F at 1; G at 1. Under Kansas law, this creates an implied covenant not to interfere with the operator's operations. *See Thurner v. Kaufman*, 237 Kan. 184, 188 (1985) ("Under an oil and gas lease, the lessee has the implied right to make reasonable use of the surface in order to develop the land for the oil and gas."); *see also Commercial Asphalt, Inc. v. Smith*, 200 Kan. 362, 367 (1968) (finding that the grantor of the mineral interest may use the surface estate so long as it does not interfere with the grantee's operations). The breach of this duty would constitute a material failure of the considerations promised.

22. Under the Kansas Leases, the Royalty Owners have also agreed to defend title to the leased properties. Joint Stipulation Exs. C ¶¶ 3, 10; D ¶¶ 3, 10; E ¶¶ 3, 10; F at 1; G at 1. The failure to perform this obligation could result in competing claims to the mineral interests. This would result in something substantially different than what Sandridge bargained for – the exclusive right to the mineral interest – and thus constitute a material breach of the Royalty Owner's obligations. The Royalty Owners have material obligations remaining under the Kansas Leases.

23. Sandridge also has material obligations remaining. Under the Kansas Leases, Sandridge is subject to both express and implied covenants that benefit the Royalty Owners. The Kansas Leases require Sandridge to bury pipe, not place wells within 200 feet of a dwelling or barn, and allow the royalty owner to use excess gas. Joint Stipulation Exs. C ¶ 8; D ¶ 8; E ¶ 8; F at 1; G at 1. Further, the Kansas Leases create implied covenants not to interfere with the royalty

owner's use of the surface estate. *Thurner*, 237 Kan. at 188–89 (finding that even without any express provision in an oil and gas leases, the lessor has the right to conduct a farming business free from injury or interference); s*ee also Commercial Asphalt*, 200 Kan. at 367. In *Thurner*, the Supreme Court of Kansas found that even in the absence of an express forfeiture provision in the oil and gas leases, cancellation may be awarded when the breach goes to an "essential" part of the lease. *Id.* at 189. "[C]ourts have found the implied covenant to develop goes to the very heart of the lease, as does the express covenant to pay royalties." *Id.*

24. Accordingly, failure by Sandridge to perform its obligations under the leases could result in lease cancellation and excuse a Royalty Owner from further performance, thus satisfying the definition of an executory contract subject to section 365.

## II. Claims under the Oklahoma Leases are Secured by Statutory Liens that Passed Through the Bankruptcy Because SandRidge Failed to Strip Them.

25. As with counterparties to executory contracts, secured creditors have rights under the Bankruptcy Code that a debtor cannot side-step simply by ignoring them. When a debtor fails to give notice of an intention to strip away liens, principles of due process and controlling Fifth Circuit case law make clear that the liens survive the bankruptcy. *See Elixer Indus., Inc. v. City Bank & Trust Co. (In re Ahern Enters., Inc.)*, 507 F.3d 817, 821–22 (5th Cir. 2007) (a plan purporting to strip liens must give notice of the plan and its effect on the creditor); *In re Spring Valley Farms, Inc. v. Crow (In re Spring Valley Farms, Inc.)*, 863 F.2d 832, 834 (11th Cir. 1989) (addressing due process requirements).

26. Here, the only "notice" in the plan of reorganization is boilerplate recitations that assets would be conveyed "free and clear." None of the Royalty Owners' liens securing the Oklahoma Leases are addressed in the plan, despite myriad other liens being identified and specifically dealt with in the plan, the plan supplement, and elsewhere in the case. Other secured

creditors had notice of SandRidge's intentions. The Royalty Owners did not. On the contrary, the only language in the plan or confirmation addressing the Royalty Owners' interests seeks to assure them that nothing in the plan would impair their rights.

27. In its pre-hearing brief, SandRidge correctly identifies the relevant Oklahoma statute that grants royalty owners liens, but incorrectly advances a tortured and narrow reading of its provisions. First, SandRidge argues that the statutory lien covers only payment of the "sales price" and, because the first purchaser has paid SandRidge, there is no obligation left for a lien to secure. SPHB at ¶ 48. Second, SandRidge argues that the liens would only "attach to the traceable proceeds of the disputed oil and gas sales," and that such tracing is, by now, impossible since the cash has been spent. SPHB at ¶ 49. Neither argument withstands scrutiny.

  **A.**   **The Royalty Owners' Claims for Royalty Underpayments on the Oklahoma Leases are Secured by Statutory Liens.**

28. The Royalty Owners have secured claims for pre-petition royalties by virtue of Oklahoma's Oil and Gas Owners' Lien Act of 2010 (the "<u>Act</u>"). 52 Okla. Stat. tit. 52, § 549.1 *et seq.* (2010). The purpose of the Act was "to give Oklahoma producers and royalty owners a first-priority lien to secure payment for their interest in oil and gas sold to a first purchaser." *Gaskins v. Texon, LP*, 321 P.3d 985, 990 (Okla. Civ. App. 2013). The Act itself expressly requires that its provisions be "liberally construed" to give royalty owners "the most comprehensive protection." 52 Okla. Stat. tit. 52, § 549.12.

29. The Act grants interest owners, including royalty owners, a lien "[t]o secure the obligations of a first purchaser to pay the sales price." 52 Okla. Stat. tit. 52, § 549.3(A). The lien is defined expansively to attach to "all oil and gas" and "[c]ontinues uninterrupted and without laps in and to all proceeds." *Id.* § 549.3(B). Further, "as between an interest owner and a representative of an interest owner . . ., such interest owner's oil and gas lien continues

uninterrupted and without lapse in proceeds in the possession or control of a representative until the interest owner on whose behalf such representative acts receives such proceeds in full." *Id.* § 549.3(C).

30. Here, the Royalty Owners are interest holders under the Act. *Id.* § 549.2 at ¶ 6. SandRidge acted as their representative under the Act to receive the sales price from the first purchaser and distribute royalties owed to the interest holders. *Id.* at ¶ 16. The Royalty Owners claim that they have not been paid the royalties that are owed. That claim is therefore secured by a lien that "continues uninterrupted and without lapse" on the proceeds of sales held by SandRidge.

31. SandRidge's assertion that third-party gas purchasers have already paid the sales price does not relieve SandRidge of its obligation to pay royalties owed to interest holders, or negate the lien securing those royalty payments granted under § 549.3(C). SandRidge's reasoning is circular because it defines the scope of the statutory lien by reference to what SandRidge has already paid – not what it actually owes. Further, the argument is irrelevant here because the amount of royalties owed is beyond the scope of this adversary. It is a fact-intensive question that looks at the sales price, the arms' length (or not) nature of the sales to the first purchaser, and the propriety of SandRidge's royalty calculations, all of which should be resolved once the Pre-Petition Action resumes.

    **B.    The Royalty Owners' Liens Remain Valid and Tracing is Not Required.**

32. SandRidge alternatively argues that, even if the Royalty Owners have liens under the Act, that there is no identifiable collateral because the Royalty Owners cannot "trace" the proceeds of the disputed gas sales. SPHB at ¶ 49. SandRidge is wrong because the Act does not require interest holders to "trace" proceeds, and instead broadly grants liens that "continue[] uninterrupted and without lapse." 52 Okla. Stat. tit. 52, § 549.3(C).

33. As a threshold matter, as SandRidge points out, tracing is an equitable concept that sets the limits of recovery under a trust or constructive trust theory. SPHB at ¶¶ 43-45. The Royalty Owners do not assert a "trust" here. There is no requirement in the Act that an interest holder must trace proceeds. On the contrary, the Act expressly provides that in the event of comingling, "the liens are not lost but attach to the commingled goods proportionately." 52 Okla. Stat. tit. 52, § 549.5, cmt. 2. This reading is consistent with the Act's command that its provisions be construed liberally in favor of interest holders.

34. Nor is there any requirement that Royalty Owners trace the specific proceeds to specific units of oil and gas production, as SandRidge argues. SPHB at ¶ 49. Such a reading would impose an impossible burden on interest holders seeking to enforce their liens against representatives holding the proceeds of oil and gas sales. Rather, a more natural reading of the statute is that the interest holder's lien attached uninterrupted in the proceeds that continue to be collected by the representative from sales under the same underlying lease.

35. Finally, to the extent the Royalty Owners must identify specific proceeds, that is a fact intensive inquiry best suited for the Pre-Petition Action when it resumes. It would be inappropriate to prevent that litigation from proceeding based on a summary prediction of its outcome. Further, if an inquiry into proceeds must be conducted at this stage in this adversary, the appropriate time to look is the Effective Date. SandRidge should not be allowed to hide behind its disbursement of proceeds after the Effective Date. *See* Amended Order Confirming the Amended Joint Chapter 11 Plan of Reorganization of Sandridge Energy, Inc. and its Debtor Affiliates [ECF No. 901] at ¶ 145 (Case No. 16-32488 Sept. 20, 2016) (stating that that the transactions that occur to consummate the plan shall not moot the litigation).

**Conclusion**

The Royalty Owners ask the Court to grant their request for declaratory judgment allowing them to commence or continue litigation so that the Royalty Owners may pursue payments due on the Kansas Leases and pursue their secured claims under the Oklahoma Leases.

Dated:  June 12, 2017                    Respectfully Submitted,


/s/ *Charles Rubio*
Charles Rubio
State Bar No. 24083768
SDOT No. 2108915
crubio@diamondmccarthy.com
Christopher R. Murray
State Bar No. 24081057
SDOT No. 1305742
cmurray@diamondmccarthy.com
909 Fannin Street, Suite 1500
Houston, Texas 77010
DIAMOND McCARTHY LLP
Telephone:     (713) 333-5100
Facsimile:     (713) 333-5199

- and -

Rex A. Sharp
State Bar No. 18118800
rsharp@midwest-law.com
5301 W. 75th Street
Prairie Village, Kansas 66208
REX A. SHARP, P.A.

*Counsel for Baker Farms, Inc. and Steven T. Bouziden Revocable Trust, Steven T. Bouziden, Trustee*

Certificate of Service

    I hereby certify that a true and correct copy of the foregoing was filed and served by the Court's ECF Noticing System on the 12th day of June 2017, to all parties registered to receive ECF Notice.

                                              */s/ Charles Rubio*