

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
02/05/2018

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 16-32488** |
| **SANDRIDGE ENERGY, INC.,** *et al* | § | **CHAPTER 11** |
| | § | |
| Debtor(s). | § | **DAVID R. JONES** |
| | § | |
| | § | |
| **BAKER FARMS, INC.,** *et al* | § | |
| | § | |
| Plaintiff(s), | § | |
| | § | |
| vs. | § | **ADVERSARY NO. 16-3223** |
| | § | |
| **SANDRIDGE E&P, LLC** | § | |
| | § | |
| Defendant(s). | § | |

## <u>MEMORANDUM OPINION</u>
### (Docket No. 1)

Baker Farms, Inc. and Steven T. Bouziden, trustee of the Steven T. Bouziden Revocable Trust, individually and on behalf of a putative class of royalty owners, (the "Plaintiffs") filed this adversary proceeding seeking declaratory relief with respect to certain oil and gas leases located in Oklahoma and Kansas under which a debtor is the lessee. After negotiation, the parties agreed to submit, in lieu of a trial, the following two questions to the Court based on legal argument along with stipulated facts and exhibits:

> **<u>Question 1</u>**: Are the Plaintiffs entitled to commence or continue an action asserting any remedies (including damages or equitable lease cancellation) against the Reorganized Debtors arising from alleged underpayments of royalties under the Gas Leases occurring on or before the Effective Date of the Plan, or, instead, is any such action barred by the injunctions in the Confirmation Order and/or the Plan subject to treatment as alleged General Unsecured Claims or otherwise under the applicable provisions of the Confirmation Order and Plan?

> **<u>Question 2</u>**: Do the provisions of the Confirmation Order and the Plan— including, but not limited to, paragraphs 72, 105, 144, and 145 of the Confirmation Order and Article IV(E) of the Plan—impact the analysis of Question 1, and if so, what impact do they have?

On June 26, 2017, the Court conducted a hearing to consider the legal arguments advanced by the parties. After considering the stipulated facts and exhibits and the legal arguments of the

parties, the Court answers the submitted questions as set forth below. A separate judgment consistent with this memorandum opinion will issue.

## Stipulated Facts

The parties submitted the following stipulated facts and exhibits[1]:

1.      On April 21, 2016, Plaintiffs filed an action in the District Court of Comanche County, Kansas, captioned *Baker Farms, Inc. v. SandRidge E&P, LLC*, No. 16-cv-000002 (the "Pre-Petition Action"), alleging the under- or non-payment of royalties on natural gas and/or constituents of the gas stream produced from wells in Kansas and Oklahoma allegedly operated by SandRidge E&P in which Plaintiffs purportedly owned an interest from May 1, 2011 onwards. On May 13, 2016, the Pre-Petition Action was removed to and is pending before the United States District Court for the District of Kansas, captioned *Baker Farms, Inc. v. SandRidge E&P, LLC*, No. 16-01133.

2.      On May 16, 2016 (the "Petition Date"), the above-captioned debtors ("Debtors, and after the effective date of the plan of reorganization, the "Reorganized Debtors") filed their voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of Texas (the "Court").

3.      On June 30, 2016, the Court entered the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(B)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(B)(9) Requests, and (IV) Approving Notice of Bar Dates* [Docket No. 431] (the "Bar Date Order"), setting the deadline to file Proofs of Claim (as that term is defined in the Bar Date Order) for claims arising before the Petition Date as July 22, 2016 (the "Claims Bar Date").

4.      On July 22, 2016, Plaintiffs, Baker Farms and Steven T. Bouziden Revocable Trust filed Proofs of Claim for Court claim nos. 256-1 and 257-1, respectively, (the "Proofs of Claim") against SandRidge E&P for the under- or non-payment of royalties alleged in the Pre-Petition Action. The Reorganized Debtors have not yet objected to the Proofs of Claim.

5.       On September 20, 2016, the Court entered the *Amended Order Confirming the Joint Chapter 11 Plan of Reorganization of SandRidge Energy, Inc. and Its Debtor Affiliates* [Bankruptcy Docket No. 901] (the

---

[1]   The stipulations of the parties set forth at Docket No. 36 are reprinted herein as submitted to the Court (including all typographical errors and incomplete sentences) for ease of reference. In reaching its decision, the Court has accepted the stipulations as true and the exhibits as admitted under the Federal Rules of Evidence.

"Confirmation Order"), confirming the *Joint Chapter 11 Plan of Reorganization of SandRidge Energy, Inc. and Its Debtor Affiliates* [Bankruptcy Docket No. 901-1] (the "Plan," as may be amended).[2]   The Plan was made effective on October 4, 2016 (the "Effective Date").   From the Petition Date of May 16, 2016 through the Effective Date of October 4, 2016, the Pre-Petition Action was stayed as against the Debtors by operation of the automatic stay arising under Section 362 of the Bankruptcy Code.

6.   The Confirmation Order provides that requests for payment of Administrative Claims must be filed no later than the first Business Day that is 30 days following the Effective Date, or November 3, 2016 (the "Administrative Claims Bar Date").   Plaintiffs did not file a request for payment of Administrative Claims by the Administrative Claims Bar Date.

[2]   All capitalized but undefined terms as used herein shall have the meaning ascribed to them in the Plan.

7.   On September 27, 2016, Plaintiffs filed the *Original Complaint for Declaratory Judgment* [Docket No. 917] (the "Complaint") against SandRidge E&P, initiating Adversary Proceeding No. 16-03223.   The Complaint seeks a declaratory judgment by this Court to address the  scope  of the Chapter 11 Plan injunctions and discharges with respect to alleged underpayment of royalties arising prior to and during the Debtors' chapter 11 proceedings and whether the Royalty Owner's legal entitlements ride through the bankruptcy case unaffected. The Debtors deny that Plaintiffs are entitled to any of the relief they seek.

8.   On January 9, 2017, the Court conducted a scheduling conference during which the Court requested that the Parties determine and stipulate to a set of legal issues to be decided in the Adversary Proceeding.  *See* January 9, 2017 H'rg Tr. at 35:8-16.

9.   On February 3, 2017, the Court entered the *Order Regarding Scope of Legal Issues and Scheduling Deadlines with Respect to Adversary Proceeding No. 16-03223* [Adv. Proc. Docket No. 27] (the "Scheduling Order"). The Scheduling Order set forth two legal issues to be determined as part of the Adversary Proceeding:

> **Question   1**: Are the Plaintiffs entitled to commence or continue  an  action asserting any remedies (including damages or equitable lease cancellation) against the Reorganized Debtors arising from alleged underpayments of royalties under the Gas Leases occurring on or before the Effective Date of the Plan, or, instead, is any such action barred by the injunctions in the Confirmation Order and/or the Plan subject to treatment as alleged General Unsecured terms or otherwise under the applicable provisions of the Confirmation Order and Plan?

**Question 2**: Do the provisions of the Confirmation Order and the Plan— including, but not limited to, paragraphs 72, 105, 144, and 145 of the Confirmation Order and Article IV(E) of the Plan—impact the analysis of Question 1, and if so, what impact do they have?

10.     The Scheduling Order also required the Parties to negotiate in good faith in preparing a stipulation of undisputed facts, pursuant to which the Parties have prepared and filed this Stipulation.

11.     The Debtors are an oil and gas company with a principal focus on exploration and production ("E&P") activities in the Mid-Continent region of the United States, primarily in Oklahoma and Kansas, and more recently in the Rocky Mountain regions, in Colorado.

12.     The Debtors conduct their E&P activities primarily through their subsidiary, SandRidge E&P. These E&P operations involve the capture and sale of oil and natural gas from domestic onshore hydrocarbon basins. Through oil and gas leases entered into with mineral rights owners throughout the Debtors' operating regions, the Debtors hold working interests in oil and gas properties that provide for the right to drill and maintain wells in the applicable geographic areas. The Debtors operate these wells with the expectation of producing and selling hydrocarbons, a portion of the proceeds of which are distributed to various working interest holders, royalty interest holders, governmental entities, and other parties, and the remainder retained as operating revenues.

13.     Through a written agreement (an "Oil and Gas Lease"), owners of mineral interests convey their right to capture minerals (a "Working Interest") to a third party (a "Working Interest Holder") in exchange for either a share of production or payments in lieu of a share of production (a "Royalty Interest").

14.     The Reorganized Debtors make royalty payments ("Royalty Payments") once a month. As a result of the time required to market and sell the production and the significant accounting process required each month to accurately disburse the resulting proceeds, Royalty Payments generally are made between 60 and 90 days after production of the underlying oil and gas. The Debtors' historical Royalty Payment practices reflect present-day Royalty Payment practices. The Parties agree that the amount of Royalty Payments owed to Plaintiffs is not at issue in this Adversary Proceeding.

15.     In the ordinary course of business, the Debtors maintain a cash management system, which is summarized on **Exhibit A**, attached hereto (the "Cash Management System"). The Cash Management System includes a total of 36 bank accounts (collectively, the "Bank Accounts"), consisting of

18 Bank Accounts at the Bank of Oklahoma, 16 Bank Accounts at Wells Fargo Bank, N.A., and one Bank account at each of Capital One Bank and Citizen's Bank (collectively, the "Cash Management Banks").

16.     SandRidge Energy, Inc. ("SandRidge"), SandRidge E&P's parent entity, maintains a deposit account at Bank of Oklahoma that serves as the centralized main operating account, which provides funding to the other accounts in

17.     The Cash Management System is comparable to the centralized cash management systems used by similarly-situated companies to manage the cash of operating units in a cost- effective, efficient manner.   The Debtors use the Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.   The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with intercompany transactions.   Additionally, the Debtors' corporate accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

18.     The Bank Accounts and the Cash Management System are described in the following table:

| Bank Accounts | Account Description |
|---|---|
| **Main Operating Account**<br><br>**Bank of Oklahoma:**<br>SandRidge Energy, Inc. – 0359 | The Main Operating Account is the primary concentration account for the Debtors' operational and financing activities.  The Main Operating Account generally maintains a balance sufficient to fund day-to-day cash needs.  The account both receives funds from, and transfers funds to, the Subsidiary Operating Accounts.   The Main Operating Account also disburses funds to multiple accounts throughout the Cash Management System, as needed.   Interest and other debt payments are made directly from the Main Operating Account. |

| **Subsidiary Operating Accounts**<br><br>**Bank of Oklahoma:**<br>• Lariat Services, Inc. – 0414<br>• SandRidge CO2, LLC – 0370<br>• SandRidge E&P, LLC – 0381<br>• SandRidge Midstream, Inc. – 0425<br>• SandRidge Operating Company – 0403<br>• SandRidge Realty, LLC – 0392 | The Subsidiary Operating Accounts are funded as necessary by the Main Operating Account. The Subsidiary Operating Accounts are zero-balance accounts, which sweep daily into the Main Operating Account. The Subsidiary Operating Accounts receive operating revenues, pay operating expenses, and make capital expenditures through various funds-transfer mechanisms other than outbound checks, including wires, ACH payments, lockbox receipts, and electronic check deposits. The Subsidiary Operating Accounts also fund the corresponding Controlled Disbursement Accounts for the applicable Operating Subsidiary. |
| **Controlled Disbursement Accounts**<br><br>**Bank of Oklahoma:**<br>• Lariat Services, Inc. – A/P – 9649<br>• SandRidge Midstream, Inc. – A/P – 9660<br>• SandRidge Operating Company – A/P – 9638<br>• SandRidge E&P, LLC – A/P – 9605<br>• SandRidge E&P, LLC – L/R – 9616<br>• SandRidge E&P, LLC – REV – 9627 | The Controlled Disbursement Accounts are funded by the corresponding Subsidiary Operating Account. The Controlled Disbursement Accounts are zero-balance accounts, which sweep daily into the corresponding Subsidiary Operating Accounts. The Controlled Disbursement Accounts are used to write outbound checks to cover operating expenses and capital expenditures (as opposed to other payment methods, which are processed through the corresponding Subsidiary Operating Account). The Debtors receive daily notice of checks that will clear from a Controlled Disbursement Account in a given day, which amount is then funded into the applicable Controlled Disbursement Account.<br><br>SandRidge E&P, which conducts the Debtors' principal operating activities, maintains three Controlled Disbursement Accounts. The first, labeled "A/P," funds general outbound checks. The second, labeled "L/R," funds rental checks associated with oil and gas leases. The third, labeled "REV," funds checks to royalty and similar interest holders. |

19.    Beginning in March 2017, the Reorganized Debtors began the process of transitioning their Cash Management System from the Bank of Oklahoma to Citizens Bank. New Citizens Bank accounts have been opened that generally reflect the Operating and Disbursement Accounts maintained at

the Bank of Oklahoma. As of April 2017, the Reorganized Debtors began operating their Cash Management System through the new Citizens Bank accounts. Aside from the location of the operating and disbursement funds, all other aspects of the Reorganized Debtors' Cash Management System remain the same.

20.     Historically, and prior to the Petition Date, the Debtors maintained a Main Operating Account, Subsidiary Operating Accounts, and Controlled Disbursement Accounts at Wells Fargo, which was the Debtors' primary Cash Management Bank. In April 2016, Wells Fargo notified the Debtors that it intended to terminate all deposit accounts the Debtors maintained at Wells Fargo (the "Legacy Bank Accounts"), the treasury management services Wells Fargo provided to the Debtors, and related agreements, effective May 31, 2016. In response, the Debtors opened 13 new bank accounts at Bank of Oklahoma, which replaced most of the Legacy Bank Accounts before the Petition Date. In virtually all other respects, the Reorganized Debtors' current Cash Management System practices are comparable to the Debtors' historic Cash Management System practices, and have been since at least May 1, 2011.

21.     The Legacy Bank Accounts and the historic Cash Management System are described in the following table:

| Bank Accounts | Account |
|---|---|
| **<u>Legacy Main Operating Account</u>**<br><br>**Wells Fargo, N.A.:** SandRidge Energy, Inc. – 5224 | The Legacy Main Operating Account was the primary concentration account for the Debtors' operational and financing activities. The Legacy Main Operating Account generally maintained a balance sufficient to fund day-to-day cash needs. The account both received funds from, and transferred funds to, the Legacy Subsidiary Operating Accounts. The Legacy Main Operating Account also disbursed funds to multiple accounts throughout the historic Cash Management System, as needed. Interest and other debt payments were made directly from the Legacy Main Operating Account. |

| **Legacy Subsidiary Operating Accounts**<br><br>**Wells Fargo, N.A.:**<br>• Lariat Services, Inc. – 0421<br>• SandRidge CO2, LLC – 5257<br>• SandRidge E&P, LLC – 6719<br>• SandRidge Midstream, Inc. – 0447<br>• SandRidge Operating Company – 0389<br>• SandRidge Realty, LLC – 4551 | The Legacy Subsidiary Operating Accounts were funded as necessary by the Legacy Main Operating Account. The Legacy Subsidiary Operating Accounts were zero-balance accounts, which swept daily into the Legacy Main Operating Account. The Legacy Subsidiary Operating Accounts received operating revenues, paid operating expenses, and made capital expenditures through various funds-transfer mechanisms other than outbound checks, including wires, ACH payments, lockbox receipts, and electronic check deposits. The Legacy Subsidiary Operating Accounts also funded the corresponding Legacy Controlled Disbursement Accounts for the applicable Operating Subsidiary. |
| **Legacy Controlled Disbursement Accounts**<br><br>**Wells Fargo, N.A.:**<br>• Lariat Services, Inc. – A/P – 8538<br>• SandRidge Midstream, Inc. – A/P – 8542<br>• SandRidge Operating Company – A/P – 8519<br>• SandRidge E&P, LLC – A/P –2555<br>• SandRidge E&P, LLC – L/R – 2589<br>• SandRidge E&P, LLC – REV – 2574 | The Legacy Controlled Disbursement Accounts were funded by the corresponding Legacy Subsidiary Operating Account. The Legacy Controlled Disbursement Accounts were zero-balance accounts, which swept daily into the corresponding Legacy Subsidiary Operating Accounts. The Legacy Controlled Disbursement Accounts were used to write outbound checks to cover operating expenses and capital expenditures (as opposed to other payment methods, which were processed through the corresponding Legacy Subsidiary Operating Account). The Debtors received daily notice of checks that would clear from a Legacy Controlled Disbursement Account in a given day, which amount was then funded into the applicable Legacy Controlled Disbursement Account. |

22. As described *supra*, each of the Reorganized Debtors' Controlled Disbursement Accounts are zero-balance accounts, and all cash in those accounts is swept daily into corresponding Subsidiary Operating Accounts. Likewise, each of the Reorganized Debtors' Controlled Operating Accounts are zero-balance accounts, and all cash in those accounts is swept daily into the Main Operating Account. As a result, all of the Reorganized Debtors' cash is ultimately swept in to, and disbursed from, the Main Operating Account as needed.

23.     The same is true of the Debtors' Legacy Bank Accounts.  As described *supra*, each of the Debtors' Legacy Controlled Disbursement Accounts were zero-balance accounts, and all cash in those accounts was swept daily into corresponding Legacy Subsidiary Operating Accounts.  Likewise, each of the Debtors' Legacy Controlled Operating Accounts were zero-balance accounts, and all cash in those accounts was swept daily into the Legacy Main Operating Account.  As a result, all of the Debtors' cash was ultimately swept in to, and disbursed from, the Legacy Main Operating Account as needed.

24.     The Reorganized Debtors turn over the cash in their Subsidiary Operating and Controlled Disbursement Accounts on a daily basis.   The Reorganized Debtors turn over the cash in the Main Operating Account on at least a quarterly basis.  The Debtors have historically turned over cash at the same rate since May 1, 2011.

25.     Plaintiff Steven T. Bouziden Revocable Trust is a royalty owner, under a certain Oil and Gas Lease with SandRidge E&P (the "Bouziden Oil and Gas Lease").   A true and accurate copy of the Bouziden Oil and Gas Lease is attached hereto as **Exhibit B**.  The Bouziden Oil and Gas Lease is governed by Oklahoma law, and has been recorded in the relevant county's clerk's  office.  Pursuant to the Bouziden Oil and Gas Lease, Plaintiff Steven T. Bouziden Revocable Trust has Royalty Interests in certain wells in Woods County and Alfalfa County, Oklahoma. SandRidge E&P was the operator of the Bouziden Oil and Gas Leases as of the Petition Date.  SandRidge E&P, as a Reorganized Debtor, continues to operate the Bouziden Oil and Gas Leases as of the date of this Joint Stipulation.  SandRidge E&P is also party to other Oil and Gas Leases in Oklahoma.

26.     Plaintiff Baker Farms, Inc. is a royalty owner, under certain Oil and Gas Leases with SandRidge E&P (the "Baker Farms Oil and Gas Leases").  True and accurate copies of the Baker Farms Oil and Gas Leases are attached hereto as **Exhibit  C**, **Exhibit  D**, **Exhibit  E**, **Exhibit  F**, and **Exhibit  G**.  The Baker Farms Oil and Gas Leases are governed by Kansas law, and have been recorded in the relevant county's clerk's office.  Pursuant to the Baker Farms Oil and Gas Lease, Plaintiff Baker Farms has a Royalty Interest in a well in Comanche County, Kansas.  SandRidge E&P was the operator of the Baker Farms Oil and Gas Leases as of the Petition Date.  SandRidge E&P, as a Reorganized Debtor, continues to operate the Baker Farms Oil and Gas Leases as of the date of this Joint Stipulation.  SandRidge E&P is also party to other Oil and Gas Leases in Kansas.

27.     SandRidge E&P maintained a Subsidiary Operating Account at the Bank of Oklahoma, which account number ends in 0381, which has since been transitioned to a Subsidiary Operating Account at Citizens Bank ("SandRidge E&P Subsidiary Operating Account").   The SandRidge E&P Subsidiary Operating Account receives the revenues associated with gas sales from the wells in which  Plaintiffs have  Royalty Interests.   Cash  in  the  SandRidge E&P

Subsidiary Operating Account is swept daily into the Main Operating Account. The SandRidge E&P Subsidiary Operating Account funded a Controlled Disbursement Account maintained by SandRidge E&P at the Bank of Oklahoma specifically to fund checks to royalty holders, including Plaintiffs, which account number ends in 9627, which has since been transitioned to a Controlled Disbursement Account at Citizens Bank (the "SandRidge E&P Royalty Controlled Disbursement Account"). After receiving revenues associated with gas sales from the wells in which Plaintiffs have Royalty Interests, Plaintiffs' Royalty Payments are calculated as set forth in Section IV.B, *supra*, and disbursed as set forth in Section V.A, *supra*.

28. SandRidge E&P formerly maintained a Legacy Subsidiary Operating Account at Wells Fargo, which account number ended in 6719 (the "Legacy SandRidge E&P Subsidiary Operating Account"). The Legacy SandRidge E&P Subsidiary Operating Account received operating revenues from the wells in which Plaintiffs have Royalty Interests. Cash in the Legacy SandRidge E&P Subsidiary Operating Account was swept daily into the Legacy Main Operating Account. The Legacy SandRidge E&P Subsidiary Operating Account funded a Legacy Controlled Disbursement Account maintained by SandRidge E&P at Wells Fargo specifically to fund checks to royalty holders, including Plaintiffs, which account number ended in 2574 (the "Legacy SandRidge E&P Royalty Controlled Disbursement Account").

29. In the Proofs of Claim and the Pre-Petition Action on which the Proofs of Claim are based, Plaintiffs allege that SandRidge E&P failed to remit the full royalty amounts owed under the Bouziden and Baker Farms Oil and Gas Leases, and other similarly situated Royalty Owners under Oklahoma and Kansas Oil and Gas Leases from May 1, 2011 to the Petition Date (the difference between what the Plaintiffs have received in royalty payments and what they claim to be owed, the "Disputed Proceeds").

30. While the Debtors deny Plaintiffs' claims that any Disputed Proceeds exist, and deny Plaintiffs' rights or claims to any Disputed Proceeds, for purposes of this proceeding, the Parties agree that, pursuant to the Debtors' historic Cash Management System practices, any such Disputed Proceeds were never and are not currently segregated, held in escrow, or otherwise held in the SandRidge E&P Royalty Controlled Disbursement Account or the Legacy SandRidge E&P Royalty Controlled Disbursement Account. Any Disputed Proceeds were commingled with the Debtors' cash in the Main Operating Account and/or Legacy Main Operating Account pursuant to ordinary course Cash Management System practices existing presently and at the time any Disputed Proceeds were collected. Any funds that could be considered as Disputed Proceeds from May 1, 2011 to the Petition Date have since been disbursed in their entirety in the ordinary course of the Debtors' and Debtors' business. The Debtors are not currently holding any funds identifiable as the Disputed Proceeds, nor are such funds being held on behalf of the Debtors by the Reorganized Debtors.

31.     In addition the parties stipulated to the admission of the following

exhibits:

> **Exhibit A**: Cash Management System Schematic
> **Exhibit B**: Oil and Gas Lease #OK017852-000
> **Exhibit C**: Oil and Gas Lease #KS002277-000
> **Exhibit D**: Oil and Gas Lease #KS002274-000
> **Exhibit E**: Oil and Gas Lease #KS002275-000
> **Exhibit F**: Oil and Gas Lease #KS002276-000
> **Exhibit G**: Oil and Gas Lease #KS013007-000
> **Exhibit H**: *Joint Chapter 11 Plan of Reorganization of SandRidge Energy, Inc. and Its Debtor Affiliates* [Docket No. 518]
> **Exhibit I**: *Notice of Filing of Plan Supplement* [Docket No. 603]
> **Exhibit J**: *Notice of Filing of First Supplement to Plan Supplement* [Docket No. 735]
> **Exhibit K**: *Notice of Filing of Second Supplement to Plan Supplement* [Docket No. 838]
> **Exhibit L**: *Amended Order Confirming the Amended Joint Chapter 11 Plan of Reorganization of SandRidge Energy, Inc. and its Debtor Affiliates* [Docket No. 901]
> **Exhibit M**: *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing Mineral Payments and Working Interest Disbursements* [Docket No. 9]
> **Exhibit N**: *Order Authorizing Payment of Mineral Payments and Working Interest Disbursements* [Docket No. 94]
> **Exhibit O**: *Class Action Petition, Baker Farms Inc. v. SandRidge E&P, LLC*, No. 16-01133 (D. Kan.)
> **Exhibit P**: *Plaintiffs' Original Complaint for Declaratory Judgment* [Adv. Proc. Docket No. 1]
> **Exhibit Q**: *SandRidge Exploration and Production, LLC's Answer and Affirmative Defenses to Royalty Owners' Original Complaint for Declaratory Judgment* [Adv. Proc. Docket No. 11].
> **Exhibit R**: Court claim no. 256, filed by Plaintiff Baker Farms, Inc. against SandRidge E&P.
> **Exhibit S**: Court claim no. 257, filed by Plaintiff Steven T. Bouziden Revocable Trust against SandRidge E&P

Question 2 concerns the potential impact of certain provisions of the confirmed plan of reorganization and the Court's confirmation order. These provisions are included below for ease of reference:

**Vesting of Assets.**

72.    Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors, including interests held by the Debtors in Non-Debtor Subsidiaries, pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors.**

105.    Except as otherwise provided in the Plan, each of the Debtors will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, conversion, dissolution or otherwise) under applicable law, and on the Effective Date, all property of the Estate of a Debtor, and any property acquired by a Debtor or Reorganized Debtor under the Plan, will vest in the applicable Reorganized Debtors, free and clear of all Claims, liens, charges, other encumbrances, Interests and other interests.

**Provisions Regarding the Royalty Owner Plaintiffs.**

144.    The lead plaintiffs in *Baker Farms, Inc. v. SandRidge E&P, LLC*, No. 16-01133 (D. Ct. Kan. 2016) (individually or as a class, the "Royalty Owner Plaintiffs") may commence an adversary proceeding in the Bankruptcy Court for a declaratory judgment (the "Royalty Status Proceeding") on whether the injunctions, discharge, and stays in the Plan apply to the Royalty Owner Plaintiffs' current or future individual or class suits brought in a court of competent jurisdiction to: (a) determine whether the Debtors and/or Reorganized Debtors have fully performed under the terms of the leases with the Royalty Owner Plaintiffs; (b) determine the amount of property, if any, that is in the Debtors and/or Reorganized Debtors possession that is the property of the Royalty Owner Plaintiffs (and not property of the Debtors' estate), and if it is determined that the Debtors and/or Reorganized Debtors are in possession of the Royalty Owner Plaintiffs' property, seek enforcement to turn over such property to the Royalty Owner Plaintiffs; and/or (c) determine whether the Royalty Owner Plaintiffs are entitled to enforce their rights under their leases and applicable state law including, without limitation, the rights under applicable state law to an

accounting or cancellation of the leases (the issues or assertions set forth in clauses (a) through (c), the "Royalty Status Issues").

145.    The transactions that occur to consummate the Plan will not moot the litigation of any of the Royalty Status Issues. Any legal entitlements or rights that the Royalty Owner Plaintiffs establish in the Royalty Status Proceeding as reflected above will be enforceable against the Reorganized Debtors to the extent so declared in the Royalty Status Proceeding. The Debtors' and the Reorganized Debtors' rights to contest, challenge, or dispute the Royalty Status Issues or the Royalty Status Proceeding are fully preserved and reserved.

E. *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors, including Interests held by the Debtors in Non-Debtor Subsidiaries, pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## Analysis

The Court has jurisdiction over this adversary proceeding pursuant to 11 U.S.C. § 1334. This adversary is a core proceeding arising under title 11 pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (K), (L) and (O).  The Court has constitutional authority to enter a final judgment in this matter under the Supreme Court's holding in *Stern v. Marshall*, 131 S.Ct. 2594 (2011).  To the extent necessary, the parties have consented to the entry of a final judgment by the Court.  *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932 (2015).

## Issues Presented

In order to resolve the questions submitted by the parties, the Court must determine the legal status of the various subject leases under the Bankruptcy Code.  With respect to the Kansas oil and gas leases, the parties agree that the applicability of 11 U.S.C. § 365 will be determinative.  The Plaintiffs assert that the Kansas oil and gas leases are both executory contracts and unexpired leases of real property.  The Debtors assert that they are neither.

With respect to the Oklahoma oil and gas leases, the Plaintiffs rely upon the existence of a statutory lien and the Debtors' purported failure to address those liens in the confirmed plan. Should no lien exist, the parties agree that the Plaintiffs' claims will be unsecured claims covered by the confirmed plan.

**The Kansas Oil and Gas Leases**.

The Plaintiffs first assert that the Kansas oil and gas leases are executory contracts under 11 U.S.C. § 365.  A contract is executory for purposes of § 365 if "at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party." *In re Murexco Petrol., Inc.*, 15 F.3d 60, 62-63 (5th Cir. 1994); *Cornett v. Roth*, 233 Kan. 936, 943 (Kan. 1983).   Whether an oil and gas lease is subject to § 365 is determined by reference to substantive state law.  *River Prod., Co., Inc. v. Webb (In re Topco, Inc.)*, 894 F.2d 727, 739 n.17 (5th Cir. 1990).   Under Kansas law, a breach is material if "the promisee receives something substantially less or different than he or she bargained for." *Dexter v. Brake*, 46 Kan. App. 2d 1020, 1034 (Kan. Ct. App. 2012).

The parties do not genuinely dispute that the Debtors' primary remaining obligation under the applicable leases is the periodic payment of royalties.[2]  The amount of alleged unpaid royalties due prior to the Effective Date of the Debtors' plan is disputed by the parties.  Kansas courts hold that the failure to pay royalties does not usually warrant the cancellation or forfeiture of an oil and gas lease, even if the lease specifically provides for its termination for the non-payment of royalties.  *See M & C Oil, Inc. v. Geffert*, 21 Kan. App. 2d 267, 271 (Kan. Ct. App. 1995); *Barker v. Kruckenberg*, 33 Kan. App. 2d 545, 547-50 (Kan. Ct. App. 2005).  Likewise, the Plaintiffs' only remaining obligation is that of defending title to the subject property covered by the lease.   Under Kansas law, a warranty of title is an agreement by the grantor "to compensate the grantee for any loss which the grantee may sustain by reason of a failure of the title which the deed purports to convey, or by reason of an encumbrance on the title."  *RAMA Operating Co., Inc. v. Barker*, 47 Kan. App. 2d 1020, 1026 (Kan. Ct. App. 2012).  At best, a breach of such a covenant creates a cause of action for damages not the termination of the underlying lease.   Under the specific facts presented by the parties, the Court finds that the Kansas oil and gas leases are not executory contracts.[3]

The Plaintiffs next assert that the Kansas oil and gas leases are unexpired real property leases under § 365.  Citing § 365(m), the Plaintiffs state that "[t]he Kansas Leases fall squarely within the expansive meaning of 'leases of real property' under section 365, which Bankruptcy Code broadly defines to include 'any rental agreement to use real property.' 11 U.S.C. § 365(m)."  Although constructed differently, each party supports its position based on the foundational assumption that an oil and gas lease under Kanas law constitutes a type of license and conveys no fee estate in real property.  The Plaintiffs conclude that if no fee estate is conveyed, the grant must therefore necessarily be a leasehold interest.  To the contrary, the Debtors argue that a license is the grant of neither a leasehold nor a fee interest.

---

[2]   In their responsive brief at Docket No. 39, the Plaintiffs attempt to manufacture "substantial ongoing obligations" such as not locating new wells within 200 feet of a building, etc.  The Court finds the argument unpersuasive.  The subject leases are mature leases.

[3]   The Court declines to find that a Kansas oil and gas lease can never constitute an executory contract.  Such a determination is not necessary to the present case and is best left to Kansas bankruptcy courts more familiar with the intricacies of Kansas oil and gas law.

In Kansas, an oil and gas lease "is not a lease in the ordinary sense" as it "conveys no interest in the land." *In re Randolph's Estate*, 175 Kan. 685, 686 (Kan. 1954). Under Kansas law, an oil and gas lease grants "the right to enter on described land, explore for oil and gas, and if oil and gas be found in paying quantities to operate and produce." *Huston v. Cox*, 103 Kan. 73 (Kan. 1918). "The term 'lease' is applied [] merely through habit and for convenience. They create no estate in land, but merely a kind of license." *Id.* The plaintiffs rely upon a single decision issued by an Oklahoma bankruptcy court in *In re J. H. Land & Cattle Co., Inc.*, 8 B.R. 237 (Bankr. W.D. Okla. 1981). This Court joins the opinions subsequently issued by Oklahoma District Courts questioning the reasoning of *J.H. Land & Cattle* under the facts presented. *See In re Heston Oil Co.*, 69 B.R. 34 (N.D. Okla. 1986), *In re Clark Res., Inc.*, 68 B.R. 358 (Bankr. N.D. Okla. 1986). The interest created under the applicable Kansas oil and gas leases based on the stipulated facts is not that of an unexpired lease of real property for purposes of 11 U.S.C. § 365.

Having concluded that the Kansas oil and gas leases are not subject to § 365, Court concludes that with respect to the Kansas oil and gas leases, the answer to Question 1 is "no." The Plaintiffs are not entitled to continue or initiate litigation regarding alleged royalty amounts owed prior to the Effective Date. Neither party advances an argument concerning the impact of the provisions referenced in Question 2. The Court therefore concludes that the meaning of these provisions is unambiguous and not subject to genuine dispute. Having answered the questions posed, the Court need not address the parties' arguments regarding the effects of the Debtors' failure to assume the Kansas oil and gas leases. Likewise, the Court need not address the various remedies that might be available to the Plaintiffs. Based on the stipulated facts and the arguments advanced, the Plaintiffs agree that if the Kansas oil and gas leases do not continue through the Debtors' bankruptcy cases unaffected, they are left with a general unsecured claim in an amount to be determined at a later date. The Court accepts that agreement.

**The Oklahoma Oil and Gas Leases**.

With respect to the Oklahoma oil and gas leases, the Plaintiffs rely upon the Oklahoma Oil and Gas Owners' Lien Act of 2010 ("Act") to assert the existence of a secured claim against the Debtors. Under the Act, royalty owners are granted a statutory lien that "attaches immediately to all oil and gas" and "[c]ontinues uninterrupted and without lapse in all oil and gas after severance; and . . . in and to all proceeds." OKLA. STAT. ANN. TIT. 52, § 549.3. Subject to certain exceptions, the statutory lien "takes priority over any other lien, whether arising by contract, law, equity or otherwise, or any security interest." *Id.* § 549.7. The Act's provisions are to liberally construed" in order to give royalty owners "the most comprehensive protection." *Id.* § 549.12. The lien has an expiration period of one year after the date the royalty payments were due. *Id.* § 549.10(A).

Notably absent from the Plaintiffs' analysis is the identification of any property to which the statutory lien attached. No assertions are made regarding cash collateral. The Plaintiffs generally assert that their liens attach to all proceeds received from the sale of the extracted minerals yet then tacitly agree that no proceeds exist. Suggestions are made regarding the Debtors' lack of good faith. The questions posed to the Court, however, go not to the merits of a particular claim, but whether a claim can be pursued outside of the bankruptcy case. The Plaintiffs argue that because their secured claims were not addressed in the Debtors' confirmed

plan, they are entitled to pursue the litigation of those claims in the state courts.  The Court disagrees with this argument.  The Debtors' confirmed plan provides treatment for "other secured claims" filed against any of the Debtors.  An Other Secured Claim "means any Secured Claim against any Debtor, other than (a) a First Lien Credit Agreement Claim, or (b) a Second Lien Note Claim." *Plan, Article I.A.91.*  Other Secured Claims receive the following treatment:

> *Treatment*: On the Effective Date, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Other Secured Claim, each such Holder shall receive either (i) payment in full in Cash of the unpaid portion of its Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, shall be paid in accordance with its terms); (ii) delivery of the collateral securing any such Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iii) Reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iv) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

*Plan, Article III.B.1.*

The claims adjudication process constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Neither party suggests any reason that the Court cannot perform its duty in a prompt and efficient manner.  Again, the substance of the questions posed to the Court is whether the Plaintiffs' claims (secured or unsecured) are affected by the bankruptcy case.  The confirmed plan expressly addresses any claim held by the Plaintiffs—secured or otherwise.  The entire reorganization process would be negated if claimants whose claims were addressed in a confirmed plan could continue to litigate those claims in other forums at their option.  The confirmed plan is binding upon the Plaintiffs and they are prohibited from commencing or continuing litigation regarding such claims that arose prior to the Effective Date.

The Court readily acknowledges that the answers to the questions submitted by the parties leave many issues unresolved.  Although it is tempted to address these issues, the Court will respect the parties' agreement and the submitted stipulations.  A separate judgment will issue consistent with this opinion.  The parties are directed to jointly contact the Court's case manager to select a date for a status/scheduling conference so that this matter might progress toward a final disposition.

**SIGNED: February 5, 2018.**

DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE